[Cite as *In re R.L.*, 2014-Ohio-3117.]

STATE OF OHIO            )            IN THE COURT OF APPEALS
                         )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT         )

IN RE: R.L.                             C.A. Nos.    27214
       S.L.                                          27233


                                        APPEAL FROM JUDGMENT
                                        ENTERED IN THE
                                        COURT OF COMMON PLEAS
                                        COUNTY OF SUMMIT, OHIO
                                        CASE Nos.    DN12-09-0623
                                                     DN12-09-0624

DECISION AND JOURNAL ENTRY

Dated: July 16, 2014

BELFANCE, Presiding Judge.

{¶1}   Appellants, Carrie L. ("Mother") and Michael L. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to minor children, R.L. and S.L., and placed them in the permanent custody of Summit County Children Services ("CSB").  For the reasons that follow, this Court affirms.

I.

{¶2}   Mother is the parent of R.L., born December 17, 2010, and S.L., born June 4, 2012.  Father is the parent of S.L.  The biological father of R.L. is unknown.

{¶3}   Mother and Father each have a long history of mental health issues and homelessness.  Because their backgrounds are important to an understanding of their current circumstances, including their mental health diagnoses, their backgrounds are reviewed here.  As a young child, Mother was sexually abused by her father, who was subsequently convicted of the

abuse. Her mother also physically abused her. At 12, Mother was psychiatrically hospitalized for thirty days, and she was hospitalized five more times during the next two years. About this time, her mother remarried and Mother was physically abused by her new stepfather. At 14, children services removed her from that home, and she was successively placed in four different foster homes and a group home. At 15, she was raped by two unrelated men. During her teen-aged years, she engaged in self-injurious behavior by cutting herself. At 22, Mother married, and her husband prostituted her for drugs. Mother was psychiatrically hospitalized for two weeks in 2009, for 30 days in 2010, and again in 2011. Mother divorced her husband in September 2011. Mother has not been employed since 2008 and has received disability insurance since 2011 for mental health reasons.

{¶4} Regarding Father, his parents separated when he was an infant. He was abused by his mother's boyfriends from the age of five, and his mother may have prostituted him. He slept with a knife to defend and protect himself. He ran away from home at the age of eight, and children services became involved, placing him in foster and group homes. He was in special education classes, was often truant from school, and dropped out in the seventh grade. At 15, he ran away from his group home and traveled around the country. At 18, he came to live with his grandmother. Father has been psychiatrically hospitalized at least six times. The reasons for his hospitalizations included threatening to burn down a neighbor's house, threatening to kill a girlfriend, and suicidality. Over the course of time, he suffered a collapsed lung, was stabbed, and suffered a gunshot wound. He supports himself with odd jobs and receives disability insurance for bipolar disorder.

{¶5} Mother and Father met while they were psychiatrically hospitalized at the same place in March 2011. At the time, Mother was married, yet when they were released from the

hospital, Mother and Father cohabited with Mother's husband and his girlfriend until Father had an argument with Mother's husband. As a result of that argument, Mother and Father moved to a tent in her husband's backyard. Mother and Father moved seven more times during their two-year relationship, often to abandoned buildings, homeless shelters, or the homes of friends.

{¶6} When this case began, the parents and both children were again staying in a shelter. Based on varied reports, it appears that one of the parents got into a dispute with someone within the shelter and was required to leave, and the other parent also left the shelter in order that the family would be together. Police soon discovered the family on the street with nowhere to go, and the police contacted CSB. The agency filed a dependency complaint in juvenile court on September 21, 2012. At the shelter care hearing, both parents stipulated to the existence of probable cause for the children's removal and consented to the children being placed in the emergency temporary custody of CSB.

{¶7} Because of the manner in which the parents left the shelter on the night the children were removed, the parents were not permitted to return there. In order to gain access to another shelter, the parents were required to obtain "medical clearance[.]" Accordingly, they went to Portage Path Behavioral Health on their own to attempt to secure such clearance and completed psychological examinations there. The case plan acknowledged the completion of those evaluations, which found "extensive mental health diagnoses" for both parents, and the records were admitted into evidence.

{¶8} In further court proceedings, the children were adjudicated dependent and were placed in the temporary custody of CSB. The trial court adopted a case plan, which addressed concerns of mental health and safe, stable housing. The case plan offered each parent two-hour visits twice weekly at the visitation center.

{¶9} In December 2012, Father's visits were suspended because of his confrontational, disruptive, and threatening behaviors with staff before and after visits at the visitation center. Mother was supportive of Father and testified, contrary to the testimony of other witnesses, that Father "'calmly walked' away" from all situations "'as he always does[]'" and that she never saw Father get upset. The magistrate determined that Mother's testimony "lacked any credibility whatsoever." Accordingly, both parents were ordered to have more thorough parenting evaluations to determine their ability to meet the needs of their children. Those evaluations are also included within the record, along with the testimony of the evaluating psychologist, Dr. Sylvia O'Bradovich.

{¶10} The evidence before the trial court demonstrated that Mother had been diagnosed with posttraumatic stress disorder ("PTSD"), bipolar disorder, depression, personality disorder with dependent traits, mild mental retardation, and cocaine dependence in full remission. Mother had been treated off and on for trauma related to her sexual abuse since she was eight years old, approximately twenty years. Mother has received treatment in at least eight different facilities and has been hospitalized for mental health or substance abuse multiple times.

{¶11} Mother reported that her diagnosed conditions negatively affected her behavior and functioning. She described periods of depression lasting months at a time, with crying spells, irritability, and decreased concentration, followed by weeks of high energy, with racing thoughts and during which she needs only two hours of sleep a night. She claimed to feel anxious all the time, with rapid heartbeat, difficulty breathing, sweating, lightheadedness, and nausea. She suffers flashbacks, avoidance of things that remind her of her prior abuse, distrust of others, and angry outbursts that led her to kick holes in walls. Mother reported that smelling her father's cologne would trigger increased depression and nightmares.

{¶12} Dr. O'Bradovich explained that Mother's PTSD diagnosis was related to the sexual abuse occurring over the course of her life. As a result of the PTSD, Mother experiences nightmares, depressed mood, and an inability to focus on the present during the flashbacks of her sexual abuse and rape. The psychologist testified that these symptoms have been present since childhood and can affect parenting because they come on unpredictably and can be dangerous, especially with young children who are very dependent. In addition, because of her personality disorder with dependent features, Mother tends to remain in relationships even after they become unstable and chaotic and is willing to tolerate unpleasantness in order to maintain the relationship.

{¶13} At the permanent custody hearing, Dr. O'Bradovich specifically addressed Mother's parenting ability. She testified that Mother lacks the cognitive maturity to plan ahead and will have a difficult time meeting her own needs or providing the daily necessities for a household. She believes that Mother could handle simple tasks, but would have difficulty with more complicated matters. For example, she might be confused by a doctor's instructions for the care of a sick child. Dr. O'Bradovich noted that Mother did not appreciate the risks or problems associated with not having housing for her children, nor did Mother see a problem in Father threatening others and causing problems at the visitation center.

{¶14} In conclusion, Dr. O'Bradovich stated that Mother is emotionally unstable and had a history of reckless drug use and self-injurious behavior. Mother is dependent on others and does not take responsibility for her actions or her own problems. She has a significant history of trauma and continues to experience related symptoms of avoidance, flashbacks, sleep disturbances, and nightmares. These traits were said to negatively affect her ability to provide a safe environment for her children.

{¶15} For his part, Father has been diagnosed with depression, anxiety, PTSD, schizoaffective disorder, bipolar disorder, poly-substance abuse, and antisocial personality disorder. Dr. O'Bradovich reported that Father was on a list to not be allowed re-admittance to one hospital because of his destructive behaviors while on the psychiatric unit.

{¶16} Father has reported increasing thoughts about his past abuse and believed it was affecting his thought processes. He cited nightmares, difficulty focusing, and feeling hopeless. At times, he has panic attacks two or three times a day. He also reported intrusive memories and flashbacks about being shot and stabbed.

{¶17} Dr. O'Bradovich described Father as having a currently active psychotic disorder, paranoia, disorganized and delusional thinking, and being subject to easy agitation. In addition, she said he is an angry, hostile, and aggressive individual who attempts to intimidate and threaten others. She also indicated that he is defensive and manipulative. He tends to blame others for his mistakes and does not take responsibility for his actions. He ignores financial obligations and has a pattern of housing instability. She stated that he has a history of substance abuse, which is problematic in light of his psychiatric disorder because such abuse may increase his psychotic symptoms and decrease his insight and judgment. Dr. O'Bradovich found that Father displayed delusional thinking about his own self-importance and persecutory beliefs. He told his evaluators that "'you're talking to the smartest person ever[.]'" Dr. O'Bradovich believed Father's insight and judgment were poor, and she reported that he does not plan ahead for anything. He was easily agitated throughout the evaluation, often yelling at the evaluators without provocation.

{¶18} Regarding Father's parenting ability, Dr. O'Bradovich stated that he presents a continuing risk of aggressive behavior, anger towards his child, and irresponsibility such that he

will be unable to consistently meet his child's needs. Dr. O'Bradovich believes Father has "significant parenting deficits with regard to providing a safe environment for his child and he lacks sufficient knowledge and skills to adequately parent children." She described Father as actively delusional and out of touch with reality. This could present particular problems in parenting, she explained, when he believes he has the ability to cure an ill child. Father's plan was to take the child to Mississippi and reside with his mother, the same person who had badly mistreated him as a child.

{¶19} The parents reported that they had been engaged to be married at the start of the case. They had recently relied solely on each other for support. By the time of the permanent custody hearing, however, neither of them wished to continue their relationship with the other. In fact, by the end of the case, there was a no contact order in place between them, and each of them came to believe the other is a poor parent. Neither of them has a good support system of friends or family.

{¶20} On July 29, 2013, CSB moved for permanent custody. Mother and Father each moved for a six-month extension of temporary custody. On December 31, 2013, the trial court granted permanent custody to CSB and terminated the parental rights of Mother and Father. Mother and Father separately appealed, and this Court later consolidated their appeals for purposes of review.

II.

MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TERMINATING APPELLANT-MOTHER'S PARENTAL RIGHTS AND RESPONSIBILITIES WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TERMINATING APPELLANT-FATHER'S PARENTAL RIGHTS AND RESPONSIBILITIES WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶21} Mother and Father each contend that the judgment terminating their parental rights is against weight of the evidence. Because the arguments are related, they will be considered together.

{¶22} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶23} The trial court found that the first prong of the permanent custody test was satisfied by a finding that the children could not be placed with either parent in a reasonable time or should not be placed with either parent. *See* R.C. 2151.414(B)(1)(a). In so finding, the court relied upon R.C. 2151.414(E)(10), abandonment, as to the unknown father of R.L., and cited two grounds, R.C. 2151.414(E)(1), failure to remedy conditions, and R.C. 2151.414(E)(2), chronic mental illness, as to Mother and Father.

{¶24} In their respective appellate briefs, Mother and Father only address the trial court's finding under R.C. 2151.414(E)(1) and do not contest the trial court's reliance on R.C.

2151.414(E)(2). Indeed, they make no challenge whatsoever to the trial court finding under R.C. 2151.414(E)(2). Pursuant to the plain language of the statute, the existence of only one of the factors under R.C. 2151.414(E) is sufficient to determine that a child cannot be placed with a parent within a reasonable time. *See* R.C. 2151.414 (E). ("If the court determines * * * that *one or more* of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.") (Emphasis added.) To demonstrate reversible error, the parents must demonstrate not only trial court error, but prejudice resulting from that error as well. *In re A.S.*, 9th Dist. Lorain Nos. 14CA010532, 14CA010534, 2014-Ohio-2458, ¶ 11. Even assuming merit in the parents' challenge to R.C. 2151.414(E)(1), the trial court's second and alternative finding under R.C. 2151.414(E)(2) would stand. Consequently, the parents have failed to demonstrate prejudice as to the trial court finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. *See In re A.S.* at ¶ 11 and *In re M.A.*, 9th Dist. Summit No. 23690, 2007-Ohio-4655, ¶ 8.

{¶25} We next consider the trial court finding that permanent custody is in the best interest of the children. When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his or her life. *See In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL

5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶26} Caseworker Jillian Rucker testified that Mother's parenting ability is marginal, she has little bond with the children, and she has not been able to demonstrate appropriate parenting techniques during visits. She tends to observe the children rather than interact with them, and she displays little affection towards them. She does not exhibit good organization, planning, or healthy food choices. Visits are often chaotic. Mother has difficulty watching both children at once or controlling them for even a two-hour visit. The staff must frequently step in to assist her. Ms. Rucker testified that she does not believe Mother could remedy these concerns and complete her case plan within six months.

{¶27} Mother testified on her own behalf. She believes she has improved, and that she is happier and not as depressed. She believes she could get assistance from a friend and a cousin. Mother also called Edward Bachman, a church outreach volunteer, as a witness, who testified that he has observed Mother to have a good heart and to be great with small children.

{¶28} Caseworker Rucker also testified regarding Father. Ms. Rucker stated that she has not seen Father accept responsibility for his actions, but instead blames everything on Mother, the guardian ad litem, or CSB. Ms. Rucker observed that Father had not had any contact with his child since December 2012. While there were a few reports that Father did well with the children at his early visits, there was also evidence of difficulties during those visits. He and Mother argued. He had difficulty feeding his daughter. The instability of his mental health and his delusions, as described by those involved in this case, created concerns for the safety of others at the center. Ms. Rucker testified that Father has yelled and screamed on the phone to herself and to other caseworkers. In addition, he became irate with witnesses in the interview

room, and in May 2013, had to be escorted out of the courthouse. Ms. Rucker does not believe Father has changed his behavior since those events. Ms. Rucker believes Father has unresolved issues of depression, anger management and homelessness. Finally, she does not believe a six month extension will make any difference because Father does not believe he has a problem.

{¶29} Lawrence Saltis, a self-described lay minister, testified that he speaks with Father four to five times a week and has tried to help him. He has not seen Father with his own child, but has seen him with other children and he treats them kindly.

{¶30} There is no evidence that the children have a positive relationship with any other family members. The guardian ad litem, Alan Futo, testified that there appears to be an affectionate and loving bond between the children and the foster mother.

{¶31} The wishes of the children were conveyed by Mr. Futo, the guardian ad litem. He recommended permanent custody for the children and believed that would be in their best interest. He believes that Mother has a "very superficial bond[]" with her children, and he expressed concern about the level of emotional connection between them. He testified that Mother was not able to maintain control of the children during visits. She tended to focus on one thing and lose sight of everything else. For example, if she was cleaning up a mess, she was not able to focus on what the children were doing. He cited Mother's inconsistency in attending counseling sessions as inhibiting her progress. The guardian ad litem stated that he met Father only once because Father left the state in August 2012. He noted Father's lack of communication with his child since she was five months old. He concluded that neither parent has shown any ability to consistently provide for the children's needs on a long-term basis. He did not believe an additional six months of temporary custody would allow either parent to make sufficient progress towards reunification.

{¶32} The third best interest factor concerns the custodial history of the children. The older child, R.L., resided with Mother from his birth in December 2010, but children services soon intervened and required Mother's own mother to supervise her care of the baby until Mother completed a parenting class. Seven months later, in June 2011, children services again interceded when Mother, Father, and R.L. were residing in a tent. R.L. was removed for a year until Mother could obtain stable housing, complete a parenting class, and participate in in-home counseling. R.L. was returned to Mother in June 2012. Three months later, R.L. and infant S.L. were removed in the present case. Both children have been in the custody of CSB since September 2012.

{¶33} Regarding the fourth best interest factor, there was evidence before the trial court that the children were in need of a legally secure placement and that there were no suitable friends or relatives willing to provide for their care. Two relatives of Mother were contacted, but neither would accept placement of the children. The foster parents are interested in adopting the children if permanent custody is granted. Their home was described as appropriate and meeting the needs of the children.

{¶34} The parents argue that they made "significant progress" or "substantially complied" with their case plans. They claim that this entitles them to a finding that reunification is in the best interest of the children or that the granting of permanent custody is erroneous. This Court has repeatedly stated, however, that although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it. *See, e.g., In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21. Nor does compliance with a case plan, in and of itself, establish that a general grant of permanent custody to an agency is erroneous. *In re Watkins v. Harris,* 9th Dist. Summit No. 17068, 1995 WL 513118, *4 (Aug. 30, 1995). Rather,

the determination of the best interest of a child and the decision to terminate parental rights are both governed by statute, and the proper focus of a challenge to those findings is through an analysis of the relevant statutory factors in R.C. Chapter 2151. At the same time, the record in this case demonstrates neither parent has successfully addressed their mental health issues, established and maintained safe and secure housing, or demonstrated appropriate parenting techniques.

{¶35} Based upon the record before us and the arguments advanced in this appeal, we cannot conclude that the trial courts' judgment terminating the parents' parental rights is against weight of the evidence. *See Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The assignments of error are overruled.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION DENYING THE MOTION FOR SIX MONTH EXTENSION OF TEMPORARY CUSTODY WAS NOT SUPPORTED BY CLEAR AND [CONVINCING] EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION DENYING THE MOTION FOR SIX MONTH EXTENSION OF TEMPORARY CUSTODY WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶36} Both parents argue that the trial court should have granted them a six-month extension of temporary custody instead of granting permanent custody to CSB because that would be in the best interest of the children. Because this Court has concluded that permanent custody to CSB is in the best interest of the children, it would be inconsistent to conclude that an extension of temporary custody would also be in their best interests. *See In re R.H.*, 9th Dist. Summit No. 24537, 2009-Ohio-1868, ¶ 15. The trial court did not err in denying the parents'

motions for a six-month extension of temporary custody. The assignments of error are overruled.

## III.

**{¶37}** Mother's two assignments of error are overruled. Father's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
HENSAL. J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

AVIVA L. WILCHER, Attorney at Law, for Appellant.

MICHAEL J. GOEBL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.