[Cite as *In re S.P.*, 2014-Ohio-5075.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re S.P.

Court of Appeals No. L-14-1113

Trial Court No. JC 13232363

**DECISION AND JUDGMENT**

Decided: November 12, 2014

* * * * *

Adam H. Houser, for appellant.

Dianne L. Keeler, for appellee.

* * * * *

**JENSEN, J.**

**{¶ 1}** This is an appeal from a judgment of the Lucas County Court of Common

Pleas, Juvenile Division, terminating the parental rights of C.S. ("father") and appellant

Si.P. ("mother"), and awarding permanent custody of S.P. to appellee, Lucas County

Children Services ("LCCS"). For the reasons that follow, we affirm.

## Factual Background and Procedural History

{¶ 2} Preliminarily, we note that father did not participate in the termination hearing and has not filed a notice of appeal. Thus, our discussion and analysis will focus on the facts as they pertain to mother.

{¶ 3} S.P. was born on March 4, 2012. Seven months later, LCCS received a referral indicating that S.P. had missed several appointments with his pediatrician and appeared underweight for his age. The referral also indicated that mother did not utilize a car seat when transporting the infant in vehicles. LCCS intervened. Despite assistance from her caseworker, mother failed to take S.P. to various medical appointments and continued to transport the infant without a car seat.

{¶ 4} On February 1, 2013, LCCS filed a complaint in dependency and neglect in *In re S.P.*, Lucas C.P. No. JC13230110. Seven days later, mother took S.P. to the emergency room for "bruises and bumps." When the child was examined by emergency room personnel, they could find no injuries on the child.

{¶ 5} On February 13, 2013, LCCS amended its complaint to include a request for shelter care. LCCS was awarded interim temporary custody on February 13, 2013. The initial complaint could not be heard within 90 days of its filing. Thus, the matter was dismissed.

{¶ 6} On May 1, 2013, LCCS filed its complaint in the instant action alleging, in part, that S.P. was underweight for his age, that mother did not utilize a car seat when

2.

transporting the child in vehicles, that mother slept most of the night and day and failed to attend to the child, and that mother suffered from paranoid thoughts and delusions.

{¶ 7} On July 17, 2013, the parties, including mother and father, agreed to a finding of dependency. The court awarded temporary custody of S.P. to LCCS. Case plans were implemented with the goal of reunification. S.P. was placed in the care of a maternal relative.

{¶ 8} A review hearing was held on October 24, 2013. Caseworker Tymeeka Gipson indicated the placement was going well; S.P.'s needs were being met, and he was "thriving to the best of his ability" within the relative's home. Gipson further indicated that mother completed her assessment and had been diagnosed with "psychotic disorder none other specified." Despite therapy sessions with a licensed social worker, mother refused to recognize her diagnosis. When asked why mother had not been offered parenting classes pursuant to the case plan, Gipson indicated LCCS would not make parenting classes available until mother had "a clear understanding of her * * * diagnosis."

{¶ 9} Mother was allowed "level one" supervised visits with S.P. During the visits mother often voiced concerns about bruises and marks on the child. When staff members investigated mother's concerns they generally found no bruises or marks.

{¶ 10} An annual review was held February 12, 2014. At the hearing, Gipson reported that mother had "very little insight" and "did not understand the severity" of her psychotic disorder. The evidence before the trial court indicated that mother continued to

3.

have delusional thoughts and continued to accuse LCCS staff of abusing her son. Mother's attendance at therapy was inconsistent and she refused to take the medication prescribed for her.

{¶ 11} At the permanent custody hearing, Diann M. Hack, a licensed social worker with Unison Behavior, indicated that mother had been diagnosed with a psychotic disorder relating to nonbizzare type delusions. A copy of Hack's diagnostic assessment was made part of the record.

{¶ 12} Hack explained that mother's delusions related to mother's belief that people, including her doctor and landlord, wanted to have sexual relations with her. Not all of mother's delusions related to sex, however. Mother believed that wherever she went, people wanted her money, her food, and her food stamps. She accused neighbors of entering into her apartment and taking silverware and dish soap. She felt like people were always harassing her.

{¶ 13} Hack testified that mother's psychiatric appointments were scheduled "bimonthly to monthly" but that mother only showed up 30-40 percent of the time. Hack explained that mother often called to cancel her appointments indicating she no longer needed help. When asked whether mother was taking her medication as prescribed, Hack indicated that mother "always stated that she had her meds and was taking them, but it didn't seem as if she was taking them * * * because she always made mention of having issues with the pharmacy and getting the medications * * * ."

4.

{¶ 14} Hack testified that mother had moved three times since April 2013, and that during mother's most recent appointment she was still suffering from delusions. Specifically, mother had indicated that "people were still entering her apartment and taking things." During cross-examination, Hack was asked whether mother could have benefited from parenting classes, Hack responded, "I believe she should have had an opportunity to take parenting classes. I don't know if she would have benefited."

{¶ 15} Gipson testified that she was assigned to mother's case in June 2013. Gipson indicted that on several occasions she discussed with mother the importance of attending her therapy session. In response, mother would often indicate that she was not "depressed." Then, Gipson would explain to mother that her diagnosis was not depression, but a psychotic disorder. As a result of this interaction, Gipson firmly believed that mother simply did not understand the nature and extent of her mental illness.

{¶ 16} Gipson testified that mother often complained about her neighbors breaking into her apartment to use dish soap and steal silverware. Gipson further indicated that during visits, mother often complained that her son's clothes and shoes were too little when, in fact, S.P.'s clothing and shoes were appropriate for his size.

{¶ 17} Gipson indicated that mother did not understand S.P.'s feeding needs. When Gipson would explain the need to feed the child age appropriate foods, mother would "dismiss" the information.

5.

**{¶ 18}** When asked why mother was on "level one, the highest level of supervision" with her child, Gipson explained that the heightened precautions were necessary because mother had a "lack of insight as to the development of her child."

**{¶ 19}** In regard to S.P., Gipson indicated that he was receiving Help Me Grow services and early intervention for occupation and speech therapy, and that there were some concerns with his fine motor skills. Gipson further indicated that there were concerns about slow weight gain. She explained that S.P.'s pediatrician had prescribed PediaSure on a daily basis. When asked whether mother understood S.P.'s special needs, Gipson indicated that mom often indicated that she believed nothing was wrong with S.P. To further that point, Gipson stated that mother had been observed throwing away some PediaSure that had been packed in S.P.'s bag by the foster parent.

**{¶ 20}** Finally, Gipson indicated that in her opinion, it was in S.P.'s best interest for LCCS to obtain permanent custody with the goal of adoption.

**{¶ 21}** Serra Pearson testified on behalf of mother. Pearson first met mother when mother was removed from her parents. As a child, mother was in the foster care system for approximately 12 years. Pearson testified that she was very fond of mother and that mother generally reacted favorably to her.

**{¶ 22}** Pearson worked with mother throughout the instant case to help mother understand the requirements of the case plan. Pearson encouraged mother to attend her therapy appointments and take the medication prescribed to her.

6.

{¶ 23} On cross-examination, Pearson admitted that mother did not always follow her advice. And, when asked what was in mother's best interest, Pearson opined, "I do believe that I would recommend that [mother] take care of herself because I don't think – she needs to take care of herself first, and that's what I would recommend for sure. * * * I would like her to meet her counseling appointments, take her medicine that is recommended by her doctor." When asked to further explain her response, Pearson indicated, "I don't feel that you can help anybody else unless you take care of yourself first. You need to be healthy and strong as you can be and focus on yourself. Focus on herself."

{¶ 24} Anita Levin, the guardian ad litem for S.P., testified that she recommended permanent custody based on mother's "delusional thinking" and "inappropriate parenting style." She indicated that S.P. needed permanence and that it had been just about a year since he had been out of his mother's care. She indicated that the significant gains S.P. had made in small motor and gross motor abilities during that time could only be supported by permanence and stability. Levin opined that mother was not in a position to take care of her child because "she doesn't seem to have insight into the reasons" the child was taken from her.

{¶ 25} On May 6, 2014, the trial court issued a judgment entry granting LCCS's motion for permanent custody. The court found that under R.C. 2151.414(E), S.P. could not be placed with either of his parents within a reasonable time or should not be placed

7.

with either parent, and that under R.C. 2151.414(D)(1), a grant of permanent custody to LCCS was in the child's best interest. In support of its decision, the trial court explained,

> [Mother] has failed to accept the seriousness of her mental illness and the need for services to address it. The Court finds that although she wants her child to be returned to her, she has not completed the case plan that was approved by this Court or substantially remedied the conditions that caused removal. The Court finds that she has not regularly attended mental health therapy to address a psychotic disorder and is not regularly taking medication prescribed for it. The Court finds her failure to follow through with mental health services has significantly impacted her ability to realistically understand and meet her child's basic and special needs, which she has demonstrated she cannot be counted on to do. Although there was evidence that [mother] was in special classes when in school and did suffer some delays, the Court finds that there is persuasive evidence that [mother] was not so delayed that she was unable to understand that she needed to participate in mental health services, which participation would have enhanced her ability to obtain return of her child.

{¶ 26} Mother appealed and advances one assignment of error for our review.

## Assignment of Error

The termination of Appellant's parental rights was against the manifest weight of the evidence as the agency failed to make reasonable efforts to reunify the child with the mother and mother substantially complied with the case plan services.

## Standard of Review

{¶ 27} Before a trial court may terminate parental rights and award permanent custody of a child to the moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *In re R.L.*, 9th Dist. Summit Nos. 27214, 27233, 2014-Ohio-3117, ¶ 22, citing R.C. 2151.414(B)(1) and 2151.414(B)(2); *In re Williams*, 75 Ohio St.3d 95, 99, 661 N.E.2d 738 (1996).

{¶ 28} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11. The factual findings of a trial court are presumed correct since, as the trier of fact, it is in the best position to weigh the

evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Thus, judgments supported by some competent, credible evidence going to all essential elements of the case are not against the manifest weight of the evidence. *Id.*

{¶ 29} Here, the trial court found that the first prong of the permanent custody test was satisfied by a finding that the child could not be placed with either parent in a reasonable time or should not be placed with either parent. *See* R.C. 2151.414(B)(1)(a). In so finding, the court relied upon R.C. 2151.414(E)(1), failure to remedy conditions, and R.C. 2151.414(E)(2), mother's chronic mental illness.

{¶ 30} R.C. 2151.414(E) provides, in relevant part:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and

rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

{¶ 31} In her sole assignment of error, mother asserts the trial court erred when it ruled that mother "failed to remedy the [R.C] 2151.414(E)(1) and (2)." In her brief, mother does not specifically challenge the trial court's finding under R.C. 2151.414(E)(2) relating to mother's chronic mental illness. Rather, she argues the problems that initially caused the child to be placed outside the home—mother's inability to properly dress, feed and interact with the child—"could have been resolved through a parenting class." Without addressing the severity of her mental illness, mother contends that LCCS's failure to refer her to the case plan's interactive parenting class prevented reunification with her child.

{¶ 32} "Pursuant to the plain language of the statute, the existence of only one of the factors under R.C. 2151.414(E) is sufficient to determine that a child cannot be placed

with a parent within a reasonable time." *In re R.L.*, 9th Dist. Summit Nos. 27214, 27233, 2014-Ohio-3117 at ¶ 24. *See* R.C. 2151.414(E) ("If the court determines * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.") To demonstrate reversible error, mother "must demonstrate not only that the trial court committed error but also that the error negatively affected the outcome of the case." *In re A.S.*, 9th Dist. Lorain Nos. 14CA010532, 14CA010534, 2014-Ohio-2458, ¶ 11 (citations omitted). "Because the trial court is required to find only one statutory ground to support the first prong of the permanent custody test, * * * any error in its alternate findings is not prejudicial as long as one of the trial court's stated grounds is proper." *Id.* Thus, even assuming merit in mother's challenge to R.C. 2151.414(E)(1), the trial court's second and alternative finding under R.C. 2151.414(E)(2) stands. *Id.*

{¶ 33} We have reviewed the record and determined that the evidence fully supports the trial court's finding under R.C. 2151.414(E)(2) that mother "has failed to accept the seriousness of her mental illness and the need for services to address it" and that the failure has "significantly impacted [mother's] ability to realistically understand and meet her child's basic and special needs." Mother has failed to demonstrate the alleged error under R.C. 2151.414(E)(1) negatively affected the outcome of the case. *See In re R.L.*, 9th Dist. Summit Nos. 27214, 27233, 2014-Ohio-3117 at ¶ 24. Accordingly, mother's sole assignment of error is not well-taken.

12.

**{¶ 34}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant mother is ordered to pay the costs of this appeal in accordance with App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
              JUDGE

James D. Jensen, J.
CONCUR.        _____
              JUDGE

Stephen A. Yarbrough, P.J    _____
CONCURS AND WRITES        JUDGE
SEPARATELY.

**YARBROUGH, P.J.**

**{¶ 35}** I concur in the majority's decision affirming the juvenile court's judgment. I write separately to address appellant's argument challenging the juvenile court's findings under R.C. 2151.414(E)(1).

**{¶ 36}** In *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the United States Supreme Court noted that parents' interest in the care, custody,

and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." The protection of the family unit has always been a vital concern of the courts. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

{¶ 37} Ohio courts have long held that "parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children." *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 38} Thus, a finding of inadequate parental care, supported by clear and convincing evidence, is a necessary predicate to terminating parental rights. "Before any court may consider whether a child's best interests may be served by permanent removal from his or her family, there must be first a demonstration that the parents are 'unfit.'" *In re Stacey S.*, 136 Ohio App.3d 503, 516, 737 N.E.2d 92 (6th Dist.1999), citing *Quillon v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). Parental unfitness is demonstrated by evidence sufficient to support findings pursuant to R.C. 2151.414. *See In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 39} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find, by clear and convincing evidence, two things: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(d) apply, and (2) that permanent custody is in the best interests of the

14.

child. R.C. 2151.414(B)(1). As previously indicated, the juvenile court in this case examined the factors contained in R.C. 2151.414(B)(1) and found that the child could not be placed with either parent within a reasonable time or should not be placed with either parent under R.C. 2151.414(B)(1)(a). Moreover, the court examined R.C. 2151.414(D)(1) and concluded that an award of permanent custody to LCCS was in the best interests of the child. The court's findings under R.C. 2151.414(B)(1)(a) were based upon additional findings under R.C. 2151.414(E), which provides, in relevant part:

(E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental

utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

{¶ 40} In its judgment entry, the juvenile court found that R.C. 2151.414(E)(1) and (2) were applicable in this case. In particular, the court concluded that appellant failed to accept the seriousness of her mental illness and the need for services to address it. The court further found that appellant had not substantially remedied the conditions that caused removal. In support of its findings, the juvenile court noted appellant's inconsistent attendance at therapy sessions and her failure to take medication that was prescribed to treat her psychosis.

{¶ 41} In her appellate brief, appellant argues that the juvenile court's findings under R.C. 2151.414(E) were against the manifest weight of the evidence. Referring to R.C. 2151.414(E)(1), appellant contends that LCCS failed to "exercise reasonable case

16.

planning and to make diligent efforts to remedy the problems that initially caused the child to be placed outside the home." In support of her contention, appellant notes that LCCS failed to offer her an interactive parenting class. However, a review of Tymeeka Gipson's testimony from the October 24, 2013 review hearing makes it clear that the parenting classes sought by appellant were withheld as a result of appellant's refusal to recognize her mental health issues. Indeed, at a subsequent review hearing that was held four months later, Gipson indicated that appellant was still refusing to acknowledge her mental health issues. Rather, she persisted in accusing LCCS staff members of abusing the child despite no evidence to support the accusation. Moreover, Gipson testified that appellant refused to take her medication.

{¶ 42} In addition to the testimony offered at the review hearings, the testimony from the permanent custody hearing reveals that appellant only appeared at her psychiatric appointments 30-40 percent of the time. Further, Diann Hack testified that, as of the date of the permanent custody hearing, appellant was still suffering from delusional thoughts. Hack was skeptical as to whether appellant could have realized any benefit from parenting classes.

{¶ 43} In light of the foregoing, I find that the juvenile court's judgment regarding the applicability of R.C. 2151.414(E)(1) was supported by the record and was not against the manifest weight of the evidence. Furthermore, based on the evidence presented at the permanent custody hearing as to appellant's persistent mental health issues, I conclude

17.

that the juvenile court's finding under R.C. 2151.414(E)(2) was not against the manifest weight of the evidence.

{¶ 44} Accordingly, I concur in the judgment affirming the juvenile court's award of permanent custody to LCCS.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.