[Cite as *In re K.J.*, 2019-Ohio-1918.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re K.J.

Court of Appeals No. L-18-1245

Trial Court No. JC 16259525

**DECISION AND JUDGMENT**

Decided: May 17, 2019

* * * * *

Melody R. Wilhelm, for appellant.

Rebecca L. West-Estell, for appellee.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant, V.B., appeals the judgment of the Lucas County Court of

Common Pleas, Juvenile Division, granting a motion for permanent custody filed by

appellee, Lucas County Children Services ("LCCS"), thereby terminating her parental rights with respect to her son, K.J.[1]

## A. Facts and Procedural Background

{¶ 2} In December 2014, appellant, who was a minor at the time, was adjudicated a dependent, neglected, and abused child in case No. JC13231625. Consequently, LCCS was awarded legal custody of appellant, and she was placed in foster care. On December 8, 2016, while appellant was still in foster care, she gave birth to K.J. On December 10, 2016, LCCS was awarded emergency custody of K.J., and appellant was referred for anger management, mental health services, and parenting services. On December 13, 2016, LCCS filed a complaint in dependency and a motion for a shelter care hearing.

{¶ 3} In its complaint, LCCS sought, among other things, an award of temporary custody of K.J. An evidentiary hearing was held on the day the complaint was filed. At the conclusion of the hearing, the juvenile court awarded LCCS temporary custody of K.J. after noting that appellant was a minor who was in the legal custody of LCCS. At this time, K.J. was placed in foster care in the same residence as appellant.

{¶ 4} On February 9, 2017, the parties appeared before the juvenile court for an adjudication and disposition hearing. At that time, appellant was engaged in her case plan services. Indeed, the LCCS caseworker, Bridie Sekinger, testified that appellant was "very open to whatever resources are available. She's always excited about those types

---

[1] K.J.'s father, Ke.J., did not file a notice of appeal and is therefore not a party to this proceeding.

2.

of things and wants to take advantage of whatever is out there to help her." However, Sekinger did note concerns raised by the parenting services administrator that appellant was not following through with recommendations.

{¶ 5} At the conclusion of the hearing, the juvenile court found that LCCS made reasonable efforts to prevent K.J.'s continued removal from the home. The services that were offered to appellant and articulated by the juvenile court included parenting services, anger management, mental health counseling, "mother services," and enrollment at Polly Fox Academy. In its findings of fact, the juvenile court indicated that appellant was "sometimes involved in trouble at school such as fighting behavior." The court went on to approve a case plan with the goal of reunification, which was filed by LCCS on January 10, 2017. Ultimately, the court found that K.J. was dependent, and consequently awarded temporary custody to LCCS.

{¶ 6} At a subsequent reasonable efforts review hearing on June 13, 2017, Sekinger updated the court on the progress of the case. Sekinger explained that appellant was engaged in a number of case plan services at that time, including mental health counseling, independent living services, Healthy Baby Court, and the Youth Opportunity Program through the YMCA. Additionally, Sekinger stated that appellant was involved in two episodes of domestic violence with K.J.'s father. Consequently, the court directed appellant to engage in domestic violence counseling through a domestic violence program or through her mental health counselor.

3.

**{¶ 7}** On November 17, 2017, LCCS filed a motion to extend temporary custody. LCCS's motion alleged that appellant was prone to leave the foster home for several days at a time since reaching 18 years of age. Although appellant was engaged in Healthy Baby Court and was participating in mental health counseling, LCCS complained that appellant was not consistently participating in her parenting services through Mom's House and the Cullen Center. As a result, appellant was terminated from Mom's House. Moreover, LCCS alleged that appellant was resistant to trauma therapy, which was recommended by Mom's House and LCCS.

**{¶ 8}** On December 12, 2017, appellant appeared before the juvenile court for an annual review hearing and a hearing on LCCS's motion to extend temporary custody. At the hearing, Sekinger informed the court that appellant had not made any progress in her services with Healthy Baby Court. Sekinger further testified that appellant was involved in LCCS's independent living program, but was no longer engaged in services through Mom's House.

**{¶ 9}** Notwithstanding appellant's inadequate engagement in her case plan services, Sekinger commended appellant for accepting responsibility for the lack of progress in this case, noting that such behavior was atypical for appellant, who was accustomed to blame-shifting. In light of appellant taking responsibility for her actions, Sekinger believed that the appropriate course of action would be to extend the temporary custody to provide appellant more time to engage in case plan services. However,

4.

Sekinger indicated that LCCS would not be seeking another extension of temporary custody if appellant did not make significant progress.

{¶ 10} Following Sekinger's testimony, the juvenile court reviewed its notes from the June 13, 2017 reasonable efforts review hearing, and found that "the very same things were said about the parents then and now. There's been no growth, there's been no success or any progress at all, which disturbs me a lot." Ultimately, the court granted LCCS's motion to extend temporary custody on the condition that a plan be put in place to offer K.J. a permanent solution.

{¶ 11} Approximately six months later, on June 15, 2018, LCCS filed its motion for permanent custody. In the motion, LCCS summarized appellant's lack of participation in her case plan services. Specifically, LCCS alleged that appellant had poor attendance at school, causing her to miss her mental health appointments through A Renewed Mind, which she was supposed to receive while at school.[2] Moreover, LCCS alleged that appellant was discharged from her parenting services for lack of participation. Likewise, appellant failed to participate in her trauma counseling, which resulted in her dismissal from the Cullen Center and precluded her from beginning the child-parent psychotherapy program to which she was referred.

{¶ 12} In addition to its allegations concerning appellant's failure to engage in the case plan services that were offered to her, LCCS further alleged that appellant was

---

[2] LCCS also noted that appellant's tardiness over the preceding two months caused her to be removed from the graduation list at school.

5.

expecting her second child in November 2018, and had failed to secure independent housing. LCCS indicated in its motion that appellant had missed so many visits with K.J. that the two had not bonded.

{¶ 13} As a result of appellant's failure to progress on her case plan, LCCS asserted that K.J. could not and should not be placed with appellant within a reasonable time. Thus, LCCS urged that an award of permanent custody to LCCS was in K.J.'s best interests.

{¶ 14} On October 18, 2018, the juvenile court held a hearing on LCCS's motion for permanent custody, at which each party presented several witnesses.

{¶ 15} The first witness to testify was K.J.'s guardian ad litem, Darlene Piper. Piper testified that appellant was removed from two foster homes during the pendency of these proceedings. As a result, K.J., who was placed into the same foster homes as appellant, was forced to undergo three different placements, the last of which resulted in separation from appellant. Piper testified that K.J. was doing very well in his third placement, having bonded well with the foster parents and their children.

{¶ 16} Regarding appellant's relationship to K.J., Piper testified that the two seemed very close when K.J. was an infant. However, Piper described appellant's visits with K.J. as "very on and off" over the six-month period preceding the hearing. Moreover, Piper voiced concerns regarding appellant's parenting ability. Piper took issue with appellant's lack of a stable home environment and the history of domestic violence surrounding appellant. Due to appellant missing visits with K.J. and not keeping her

6.

commitments to K.J., Piper opined that appellant was not learning anything from her involvement with Healthy Baby Court.

{¶ 17} At the conclusion of her testimony, Piper recommended that permanent custody over K.J. be granted to LCCS. Piper explained that K.J. needed a stable home, something he could not receive from appellant.

{¶ 18} For its second witness, LCCS called Molly Delzeith, who was appellant's clinical therapist at the Cullen Center. On January 11, 2018, appellant met with Delzeith for a diagnostic assessment. Following the assessment, Delzeith diagnosed appellant with specified trauma and stress related disorder. A treatment plan that included weekly 50-minute visits with Delzeith was formulated in an effort to increase appellant's emotional regulation.

{¶ 19} According to Delzeith, appellant attended five weekly sessions throughout the months of January and February, but failed to attend any further weekly sessions. Delzeith explained that appellant's failure to complete her trauma counseling prevented her from engaging in the child interactive therapy services that were offered under her case plan. Ultimately, appellant was unsuccessfully discharged from the Cullen Center.

{¶ 20} For its third witness, LCCS called the Healthy Baby Court coordinator, Tasha Lothery, who testified regarding appellant's engagement with the Healthy Baby Court. According to Lothery, Healthy Baby Court is a program designed to reunite children and parents in a short amount of time by providing more support services than are customarily provided in these cases.

7.

{¶ 21} During her testimony, Lothery stated that appellant initially engaged well with the Healthy Baby Court. In addition, Lothery noted that appellant's attendance at Healthy Baby Court was consistent for the most part. However, Lothery testified that appellant's participation in the program "fell off" after four months. Indeed, Lothery stated that appellant "never really was one of those clients that engaged wholeheartedly anyway from the beginning."

{¶ 22} Lothery echoed Delzeith's testimony that appellant was unable to complete child interactive therapy due to her failure to complete her trauma counseling at the Cullen Center. Lothery also testified that appellant was referred to Mom's House for services, but was later discharged unsuccessfully. Likewise, Lothery stated that appellant was unsuccessfully discharged from Healthy Baby Court, despite her participation in the program.

{¶ 23} As its fourth witness, LCCS called K.J.'s foster mother, M.M. According to M.M., she has been K.J.'s caregiver since he was eight months old. On the issue of appellant's interaction with K.J., M.M. testified that appellant's attendance at supervised visits was always consistent. However, M.M. indicated that appellant attended fewer than half of K.J.'s medical appointments.

{¶ 24} For its fifth and final witness, LCCS called Sekinger to the stand. At the outset of her testimony, Sekinger articulated the case plan services that were offered to appellant, which included independent housing, mental health counseling, and parenting services.

8.

**{¶ 25}** Regarding appellant's engagement in mental health counseling, Sekinger testified that appellant's participation was initially consistent, but that the participation dropped off as appellant approached her eighteenth birthday. This drop off coincided with appellant's inconsistent school attendance, as the mental health treatment appellant was receiving was taking place through A Renewed Mind at appellant's school. After referencing a similar drop in attendance with the Cullen Center, Sekinger stated that appellant had not engaged in any mental health treatment between February and July 2018.

**{¶ 26}** Concerning appellant's relationship with K.J., Sekinger testified that a typical mother-child bond could be observed early on in this case, while appellant and K.J. were placed together in foster care. However, appellant and K.J. were eventually placed in separate foster homes due to appellant not wanting to be placed outside of the Toledo area. According to Sekinger, appellant and K.J.'s bond deteriorated after their separation. During supervised visits, Sekinger observed that K.J. was no longer comfortable with appellant. However, Sekinger noted that appellant remained patient with K.J. and acted warmly toward him until he became comfortable.

**{¶ 27}** In light of appellant's lack of progress on her case plan services, Sekinger reasoned that appellant was unable to demonstrate that she would be able to care for a child at this time. Consequently, Sekinger testified that she believed a grant of permanent custody of K.J. to LCCS was in K.J.'s best interests.

9.

{¶ 28} Following LCCS's case-in-chief, appellant called her first witness, L.B. L.B. is appellant's great aunt. L.B. testified that she has previously provided care and support for appellant, and could continue to do so. Further, L.B. asserted that she could assist appellant in working toward her reunification with K.J.

{¶ 29} For her second witness, appellant called her grandmother, C.B. For her part, C.B. testified that she would be supportive of appellant completing her case plan services if given additional time to do so. Specifically, C.B. testified that she offered to allow appellant and K.J. reside with her in her home. However, C.B. revealed on cross-examination that appellant had previously declined to reside with her because appellant did not want to move to C.B.'s residence in Akron.

{¶ 30} Following C.B.'s testimony, appellant took the stand. Regarding appellant's failure to continue her trauma counseling at the Cullen Center, appellant explained that she and her foster mother were not getting along so she did not have a ride to her appointments. Appellant stated that she was willing to reengage in her trauma counseling. Further, appellant testified that she was hospitalized in September 2018, which made it difficult to participate in any of her case plan services. Concerning housing, appellant testified that she had recently rented an apartment and was living on her own. Appellant went on to state that she was willing to engage in her case plan services if she were given additional time to do so.

{¶ 31} At the conclusion of the hearing, the juvenile court found that K.J. could not and should not be placed with appellant within a reasonable period of time under R.C.

10.

2151.414(B)(1)(a), and that a grant of permanent custody to LCCS was in K.J.'s best interests under R.C. 2151.414(D)(1). Consequently, the court granted LCCS's motion for permanent custody.

{¶ 32} Appellant's timely appeal followed.

## B. Assignments of Error

{¶ 33} On appeal, appellant presents the following assignments of error for our review:

> A. The Trial Court erred in finding that the child could not be placed with Mother within a reasonable time when such a finding is not supported by the manifest weight of the evidence.
>
> B. The Trial Court erred in finding that it was in the child's best interest to award permanent custody to Lucas County Children Services when such a finding is not supported by the manifest weight of the evidence.

{¶ 34} Appellant's assignments of error are interrelated and we will therefore address them simultaneously.

## II. Analysis

{¶ 35} In appellant's assignments of error, appellant argues that the juvenile court's grant of LCCS's motion for permanent custody was against the manifest weight of the evidence.

11.

**{¶ 36}** "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. In conducting a review on manifest weight, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. We recognize that, as the trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

**{¶ 37}** The termination of parental rights in this case is governed by R.C. 2151.414, which provides, in relevant part:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and

12.

convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

* * *

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

* * *

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to

the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 39} Here, the juvenile court found that K.J. could not and should not be placed with appellant within a reasonable period of time under R.C. 2151.414(B)(1)(a), and that a grant of permanent custody to LCCS was in K.J.'s best interests under R.C. 2151.414(D)(1).

{¶ 40} In making its determination under R.C. 2151.414(B)(1)(a), the juvenile court found that appellant failed to substantially remedy the conditions causing K.J. to be placed with LCCS under R.C. 2151.414(E)(1) by failing to secure stable housing or comply with her case plan services. More specifically, the court found that appellant initially engaged in her case plan services, but failed to follow through with those services, which resulted in her unsuccessful discharge from multiple treatment providers. Further, the juvenile court found that appellant demonstrated a lack of commitment toward K.J. under R.C. 2151.414(E)(4) by showing an unwillingness to provide an adequate permanent home for K.J., and by failing to comply with case plan services. We have previously explained that "'the existence of only one of the factors under R.C.

16.

2151.414(E) is sufficient to determine that a child cannot be placed with a parent within a reasonable time.'" *In re S.P.*, 6th Dist. Lucas No. L-14-1113, 2014-Ohio-5075, ¶ 32, quoting *In re R.L.*, 9th Dist. Summit No. 27214, 27233, 2014-Ohio-3117, ¶ 24.

{¶ 41} Having reviewed the record in its entirety, we find that the juvenile court's findings under R.C. 2151.414(E)(1) and (E)(4) concerning appellant's failure to comply with her case plan services are supported by the evidence adduced at the hearing on LCCS's motion for permanent custody. Our review of the hearing transcript reveals a recurring theme of appellant's non-participation in case plan services. Appellant initially complied with her trauma therapy, but ceased attending after two months, which prevented her from engaging in parenting services. Likewise, appellant stopped attending mental health counseling with A Renewed Mind when she stopped going to school.

{¶ 42} Additionally, we find that the record supports the trial court's determination that appellant demonstrated a lack of commitment toward K.J. by showing an unwillingness to provide him with an adequate permanent home. At the hearing on LCCS's motion for permanent custody, appellant testified that she had recently rented an apartment and was living on her own. However, appellant has been without independent housing throughout the course of these proceedings, and her unwillingness to provide *permanent* housing for K.J. is demonstrated by her failure to follow through with any of the case plan services offered to her by LCCS.

17.

{¶ 43} Next, we turn to the juvenile court's best interests determination under R.C. 2151.414(D)(1). In its best interests determination, the juvenile court found that, under R.C. 2151.414(D)(1)(a), K.J. is placed in an appropriate foster home that is meeting his needs and is willing to adopt him. This finding is supported by the testimony of Piper and M.M., both of whom stated that K.J. was thriving in foster care. Further, Sekinger testified that the bond K.J. initially had with appellant had visibly deteriorated over the course of these proceedings.

{¶ 44} In addition to its findings under R.C. 2151.414(D)(1)(a), the juvenile court found R.C. 2151.414(D)(1)(d) applicable, noting K.J.'s need for permanency that was the subject of some discussion at the hearing. On this issue, appellant argues that she simply needs more time to complete her case plan services, and therefore the juvenile court should have granted another six-month extension of temporary custody rather than award permanent custody to LCCS. Notably, appellant has produced no evidence to suggest that she will follow through with the services she needs to complete in order to restore her custody of K.J. Given appellant's historical failure to consistently engage in her case plan services, we find that the record supports the juvenile court's determination that permanency for K.J. was unlikely to be achieved without the grant of permanent custody.

{¶ 45} For the foregoing reasons, we find that the juvenile court's award of permanent custody to LCCS under R.C. 2151.414 was not against the manifest weight of the evidence. Accordingly, appellant's assignments of error are not well-taken.

18.

### III.  Conclusion

{¶ 46} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Christine E. Mayle, P.J. _____

Gene A. Zmuda, J. _____
CONCUR.

_____
JUDGE

_____
JUDGE