[Cite as *In re A.W.*, 2017-Ohio-7786.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: A.W.
    I.W.
    O.W.

C.A. No.     17CA011123

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    14JC44240
                    14JC44241
                    16JC48999

DECISION AND JOURNAL ENTRY

Dated: September 25, 2017

---

TEODOSIO, Judge.

**{¶1}** Appellant Mother appeals the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor children, A.W., I.W., and O.W., and placed the children in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

**{¶2}** Mother is the biological mother of A.W. (d.o.b. 11/17/12), I.W. (d.o.b. 6/7/14), and O.W. (d.o.b. 5/11/16). These children have the same biological father, who did not appear for the permanent custody hearing and is not a party to this appeal. Mother is also the biological mother of an older son, who is in the guardianship of a third party; and another child born during the course of these cases below and ultimately placed in the permanent custody of LCCS. Those two children are not subjects of this appeal.

**{¶3}** In December 2014, LCCS filed complaints alleging that A.W. and I.W. were neglected and dependent children. Specifically, the agency alleged that the children lacked proper parental care because of the faults or habits of the parents; the parents neglected or refused to provide proper or necessary care for the children's well-being; the children lacked adequate care by reason of the mental or physical condition of the parents; and the children's condition or environment was such as to warrant the state, in the interests of the children, in assuming their guardianships.

**{¶4}** On February 27, 2015, A.W. and I.W. were adjudicated neglected and dependent based on the following facts: Mother and Father had been evicted and were living with the children in the home of a maternal great grandmother. After Mother's 16-year old sister alleged that Father sexually assaulted her, the maternal great grandmother told Father to leave. Instead of remaining in the home, Mother took A.W. and I.W. and left with Father. Because they had no home, the four slept in the car in the cold of winter, despite pleas by family members and an LCCS caseworker that Mother bring the children back inside their great grandmother's home. Another of Father's children (not a child of Mother) had sustained serious, permanent injuries while in Father's care. Concerns regarding domestic violence, parenting skills, mental health issues, and substance abuse issues were all implicated.

**{¶5}** A.W. and I.W. were placed in the temporary custody of LCCS on February 27, 2015, and the agency's proposed case plan was adopted as the order of the court. Mother's case plan objectives included attending the children's appointments to assist in their care and remain aware of their needs; attending family team meetings in the interest of permanency for the children; obtaining safe and stable housing with working utilities and ample food; obtaining income to maintain housing and support herself and her children; completing a domestic

violence assessment with Genesis House and following all recommendations; completing a mental health assessment and following all recommendations; providing true information for all assessments; and attending and completing parenting classes.

{¶6} In May 2015, LCCS filed a motion for legal custody of A.W. and I.W. to a non-relative third party, based on Mother's lack of stable housing, inconsistent mental health treatment, her failure to complete parenting classes and attend domestic violence counseling, and her ongoing relationship with Father who was Mother's abuser. The agency was also concerned about Father's lack of case plan compliance. After a hearing, the juvenile court found that Mother was working part-time, but had not obtained stable housing and was unable to provide for the basic needs of the children. Mother had been inconsistent in participating in mental health counseling, had missed two rounds of parenting classes, failed to attend domestic violence counseling, and was in an ongoing relationship with Father. Mother was pregnant with Father's child at that time. In addition, Father was homeless, had not visited with the children for months, had failed to follow through with drug/alcohol treatment and parenting classes, and was still a suspect in the child abuse case involving another of his children. On July 27, 2015, the juvenile court placed A.W. and I.W. in the legal custody of a third party with protective supervision to LCCS. Mother and Father were each granted two hours of supervised visitation each week.

{¶7} Mother gave birth to Father's child (4-A.W.) on August 11, 2015. They agency obtained emergency temporary custody of that child two days later, and filed a complaint. That child was adjudicated neglected and dependent, placed in the temporary custody of LCCS on October 27, 2015, and added to the case plan. Shortly before that in early October 2015, LCCS moved to terminate protective supervision of A.W. and I.W., because the children were in a safe and stable environment, while Mother and Father had still not made any progress on their case

plan objectives. Because no party objected, the juvenile court terminated protective supervision on October 14, 2015, and A.W. and I.W. remained in the legal custody of the third party. Because of the timing of these events, Mother and Father would not have been subject to a case plan for 13 days between October 14 and October 27, 2015. In general, Mother's case plan objectives remained the same at all times when a case plan was the order of the court. As the cases proceeded and Mother failed to substantially comply with her objectives, however, the agency included additional objectives that there be no further domestic violence incidents between Mother and Father and/or any boyfriend, that Mother comply with any temporary protection orders in existence, that Mother regularly attend visitations with the children, and that Mother demonstrate what she was learning from parenting and domestic violence classes and mental health counseling sessions.

{¶8} On March 31, 2016, while 4-A.W. was still in the temporary custody of LCCS, the agency filed a motion for temporary custody of A.W. and I.W.; because their legal custodian was medically unable to continue to care for the two children, and Mother and Father continued to demonstrate a lack of stability and case plan compliance. In April 2016, the agency obtained emergency temporary custody of A.W. and I.W., and sought an order allowing the agency to bypass providing reasonable efforts to facilitate reunification of the children with Father, as Father's parental rights had recently been involuntarily terminated as to another child who suffered severe abuse while in Father's custody.

{¶9} On May 11, 2016, Mother gave birth to another of Father's children. The child, O.W., was born prematurely at 28 weeks gestation, and spent the first couple months of her life in the hospital.

{¶10} On June 21, 2016, the juvenile court ordered that A.W. and I.W. be returned to the temporary custody of LCCS. The court noted that Mother was living in a home where another resident had pending child pornography charges. It also noted that Mother was maintaining contact with Father despite the existence of a temporary protection order, and that Mother was also in a new relationship with a man who had pending domestic violence charges and a criminal history. The court adopted the latest case plan proposed by the agency. That case plan also referenced O.W.

{¶11} On July 6, 2016, LCCS filed a complaint alleging that O.W. was a dependent child, and obtained emergency temporary custody of that child on July 12, 2016, upon her release from the hospital. On October 12, 2016, O.W. was adjudicated a dependent child, and the juvenile court placed her in the temporary custody of the agency the same day. Mother was granted a minimum of three hours of supervised visitation per week, to take place either at the agency or a place approved by the agency. The juvenile court approved the current case plan. Later in October 2016, the juvenile court issued two orders regarding the reasonable efforts the agency must use. As to Father, the trial court granted the agency's motion to bypass the requirement for reasonable efforts based on the involuntary termination of Father's parental rights regarding a sibling of O.W., who was not also Mother's child. The juvenile court further ordered that, per agreement of the parties, LCCS would not move to bypass the requirement to use reasonable efforts as to Mother despite the termination of her parental rights regarding 4-A.W., who had been born during the pendency of these cases.

{¶12} On December 14, 2016, LCCS filed a motion for permanent custody regarding A.W., I.W., and O.W., alleging multiple first-prong grounds pursuant to R.C. 2151.414(B)(1), and that permanent custody was in the best interest of the children. The matter proceeded to a

hearing before the court. After the conclusion of the hearing, LCCS submitted a proposed judgment entry for approval. On March 28, 2017, the juvenile court issued a judgment substantially similar to the agency's proposed judgment,[1] awarding permanent custody of A.W., I.W., and O.W. to LCCS, and terminating Mother's and Father's parental rights. Mother timely appealed and raises three assignments of error for review. This Court consolidates some assignments of error to facilitate review.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY TO THE AGENCY RATHER THAN ALLOW FOR A SIX-MONTH EXTENSION OF TEMPORARY CUSTODY CONSTITUTED AN ABUSE OF DISCRETION AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THEREBY VIOLATING MOTHER'S DUE PROCESS RIGHTS PURSUANT TO THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTITUTION.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT'S FINDING THAT IT WAS IN THE CHILDREN'S BEST INTERESTS TO GRANT PERMANENT CUSTODY TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Mother argues that the juvenile court's award of permanent custody is against the manifest weight of the evidence. This Court disagrees.

{¶14} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the

---

[1] The final judgment includes a couple additional factual findings, but the judgment does not hinge on any of these additional findings of fact.

[judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶15} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 97-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶16} The juvenile court found that the first prong of the permanent custody test was satisfied because (1) "these children and another child in the custody of Mother" have been adjudicated neglected and/or dependent on three separate occasions (R.C. 2151.414(B)(1)(e)); (2) Father abandoned the children (R.C. 2151.414(B)(1)(b)); (3) A.W. and I.W. were in the temporary custody of LCCS for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); and (4) the children cannot be placed with either parent within a reasonable

time or should not be placed with either parent in consideration of the factors listed in R.C. 2151.414(E) (R.C. 2151.414(B)(1)(a)).

{¶17} This Court has repeatedly recognized that the five factors listed in R.C. 2151.414(B)(1)(a)-(e) are alternative findings, and that the agency need only prove one in order to satisfy the first prong of the permanent custody test. *In re E.M.*, 9th Dist. Wayne No. 15CA0033, 2015-Ohio-5316, ¶ 12, quoting *In re S.G.*, 9th Dist. Wayne No. 15AP0005, 2015-Ohio-2306, ¶ 11. Where a parent fails to challenge a first-prong finding, we normally conclude that the parent has failed to demonstrate prejudice. *In re S.G.* at ¶ 11. Nevertheless, in this particular case, this Court declines to strictly adhere to that analytical reasoning. While Mother has challenged two of the three first-prong findings relevant to her, she has failed to challenge the juvenile court's finding pursuant to R.C. 2151.414(B)(1)(e). Here, however, we take no position on the propriety of the juvenile court's application of R.C. 2151.414(B)(1)(e) grounds to the underlying facts. We further emphasize that our position is not to be construed as recognizing that the juvenile court properly applied R.C. 2151.414(B)(1)(e) under these circumstances.

{¶18} Mother challenges the juvenile court's first-prong findings that A.W. and I.W. were in the temporary custody of LCCS for 12 or more months of a consecutive 22-month period, and that the three children could not be placed with either parent within a reasonable time or should not be placed with either parent. A review of the record indicates that, in calculating time, the juvenile court counted time that the children were in emergency temporary custody after they disrupted from their permanent disposition of legal custody to a third party. Considering only the time that A.W. and I.W. were in temporary custody, with due regard for the directives in R.C. 2151.414(D)(1), this Court concludes that A.W. and I.W. were in the

temporary custody of LCCS for 11 months and 27 days, just shy of the required 12 months to satisfy R.C. 2151.414(B)(1)(d). This conclusion, however, does not end the inquiry; as we have "repeatedly emphasized that any error in [the juvenile court's] alternate findings is not prejudicial as long as one of the trial court's stated grounds is proper." *In re S.H.*, 9th Dist. Summit Nos. 27574, 27589 and 27595, 2015-Ohio-1259, ¶ 19, citing *In re R.H.*, 9th Dist. Lorain Nos. 11CA010002 and 11CA010003, 2011-Ohio-6749, ¶ 13-14.

{¶19} Pursuant to R.C. 2151.414(B)(1)(a), in determining that children cannot be placed with either parent within a reasonable time or should not be placed with the parents, the juvenile court must consider "all relevant evidence[,]" including the sixteen factors enumerated in R.C. 2151.414(E). Relying on the plain language of the statute, this Court has held that "the existence of only one of the factors under R.C. 2151.414(E) is sufficient to determine that a child cannot be placed with a parent within a reasonable time." *In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 24. In its judgment entry, the juvenile court made findings based on R.C. 2151.414(E)(1), (4), (10), and (11).

{¶20} As to Father, the evidence established that Father abandoned the children (R.C. 2151.414(E)(10)), and that his parental rights had been involuntarily terminated with respect to the children's half-sibling (R.C. 2151.414(E)(11)).

{¶21} As to Mother, LCCS established by clear and convincing evidence that Mother failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside their home, despite reasonable case planning and diligent efforts by CSB to assist her. R.C. 2151.414(E)(1). That provision states in full:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to

substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

*Id.*

{¶22} The children were placed outside of the home based on concerns that their basic needs were not being met based on the poor judgment exhibited by Mother. As to A.W. and I.W., Mother chose to live with the children and Father in a car in inclement December weather, rather than remain in a safe and appropriate home separate from the man who had allegedly sexually assaulted her sister. I.W. was sick and required medical care at the time, but Mother failed to seek such care for the child. In addition, there were concerns about the children's exposure to domestic violence in the home. After O.W. was born prematurely, she was removed based on Mother's lack of stable housing, failure to address her mental health issues, ongoing concerns regarding domestic violence, and failure to make any progress on her ongoing case plan objectives.

{¶23} Mother focuses her argument on the agency's alleged failure to use reasonable case planning and diligent efforts to assist her, as well as her asserted substantial and successful compliance of case plan objectives, notwithstanding the agency's failure to assist her.

{¶24} Although Mother is correct that she would not have been under court order to comply with case plan objectives with regard to A.W. and I.W. when they were in the legal custody of a third party, Mother at all times, from the removal of A.W. and I.W. in December 2014 until the permanent custody hearing in March 2017, had one or more children who were involved with LCCS. With the exception of a 13-day period from October 14, 2015, when protective supervision of A.W. and I.W. was terminated, until October 27, 2015, when 4-A.W.

was adjudicated, placed in temporary custody, and his case plan was adopted, Mother was subject to case plan objectives which remained substantially the same for over two years. The LCCS caseworker testified that Mother failed to remedy the problems which necessitated removal of the children, despite reasonable case planning and diligent efforts by the agency.

{¶25} Mother's first case plan objective required her to meet the basic needs of the children by regularly visiting with the children, participating in family team meetings, attending the children's appointments, obtaining and maintaining stable housing, and obtaining income to allow her to provide for the children's basic needs. Mother's visitation with the children was sporadic. Since A.W. and I.W. were returned to agency care after their legal custodian could no longer care for them, Mother attended only 14 of her 48 scheduled visitations, often arriving late or leaving early when she did appear. Since O.W. was taken into custody, Mother attended only 12 of her 34 scheduled visitations with that child. When O.W. was in the hospital for a couple months after birth, Mother rarely visited that child even though the agency provided her with a gas card and the hospital offered to provide free nearby hotel lodging. Mother failed to visit with any of the children during the three-month period prior to the permanent custody hearing, claiming she felt too overwhelmed. Although the agency offered Mother additional hours and days of visitation, and offered to coordinate visitation times to work with her schedule, Mother declined those offers. The caseworker testified that she notified Mother regarding family team meetings and appointments. Mother admitted that she was aware of these events, and further admitted that she failed to attend all but a couple.

{¶26} As to housing, Mother moved from place to place throughout much of the time her children were in agency care. Despite the caseworker's coordination with Catholic Charities which agreed to pay Mother's utilities and past public housing fine (because Father had punched

a hole in the wall), Mother failed to follow through to obtain that help. Six months before the permanent custody hearing, Mother obtained housing with her father. The home has three bedrooms, one of which is a tiny 6 feet by 8 feet room. Mother planned to sleep on the couch and let her children sleep in her bedroom. When the caseworker visited the home, Mother had only a portable crib and a bouncy chair for the children. The agreement between Mother and her father was that Mother would pay one-half of the rent and expenses. Although Mother had not been contributing at all financially to the housing costs, her father testified that he would continue to support her. The caseworker was concerned that this housing arrangement was not in fact stable based on the maternal grandfather's past refusal to help Mother because of her poor choices, as well as Mother's reported current tensions between her and her father. Although Mother had resided in the past with her maternal grandmother, the caseworker testified that that home was no longer suitable; because Mother's uncle also resided in the home, and he had pending child pornography charges.

{¶27} Mother's employment history throughout these cases was sporadic. She worked for a temporary agency, and picked up temporary part-time jobs as they were available. Her longest steady period of employment lasted only three months, after which Mother quit because she did not like the working environment. Her most recent job, for which she was paid approximately $40 per week, ended the week before the permanent custody hearing, and she had not secured new employment. Mother claimed to be unable to maintain employment, because she feels overwhelmed by her obligations to visit with the children and participate in mental health and domestic violence counseling; but the caseworker testified that Mother was not regularly meeting those obligations either. Accordingly, Mother was unable to demonstrate that she was able to maintain consistent employment, or any employment that was sufficient to allow

her to provide for the children's basic needs. Significantly, Mother had a child support arrearage of between $8000 and $9000 at the time of the hearing. The caseworker testified that Mother had qualified for food stamps, but she let that benefit lapse. Although the caseworker signed all the paperwork from Human Services to allow Mother to continue receiving benefits, those only lasted for six months; and Mother failed to appear for her appointment to extend her benefits.

{¶28} Mother's next case plan objective required her to attend Genesis House for domestic violence counseling to address her past victimizations, to demonstrate that she had internalized the information, and to comply with any existing temporary protection or no contact orders. Father pleaded guilty in September 2015 to domestic violence charges against Mother, and a no contact order was issued as a result. Although the caseworker had made a referral to Genesis House for Mother in August 2015, Mother declined to participate there. Mother instead sought domestic violence services through Abigail Ministries, which provides services even if a victim continues to maintain contact with her abuser. Because the caseworker believed that Abigail Ministries' program was also very good, she authorized Mother's participation there. Mother met with a counselor three times at the end of 2015, and once in September 2016, but did not successfully complete that program. Mother later began the 12-week program at Genesis House in December 2016. She completed that program a few days before the permanent custody hearing. Nevertheless, neither the caseworker nor the guardian ad litem believed that Mother had internalized the information. Specifically, Mother continued to be involved with two violent individuals: Father, and a man named Eric whom Mother continued to visit in jail, although she was not visiting her children. Despite the no contact order between Father and Mother, Mother admitted that she maintains verbal, texting, and face-to-face communications with Father, but merely to keep him informed about the children, in the hopes that Mother and Father will be able

to co-parent the children. Mother could not explain why Father, who had not had any contact with the children for a long time and who was no longer engaging in case plan efforts, might be a viable option for custody.

{¶29} Mother denied maintaining romantic relationships with either Father or Eric, but friends and family members expressed concerns that Mother would re-engage in a relationship with Father or some other inappropriate partner. In fact, the caseworker's investigation indicated that Mother was visiting Father at his home, where he lived with his mother, and spending hours alone with Father in his bedroom. Even Mother's father, who offered support for Mother, testified that he was concerned that Mother would begin "running around with riffraff" like Father if the children were returned to her.

{¶30} Mother's next case plan objective required her to obtain a mental health assessment, truthfully respond during the assessment, and follow all recommendations. The agency referred Mother for mental health services. In January 2015, Mother went to the Nord Center, met with a counselor for two sessions, and dropped out. In November 2015, she re-engaged at the Nord Center with a different counselor, attended ten sessions, but was terminated based on inconsistent attendance. In September 2016, Mother became suicidal and checked herself into Mercy Hospital, where she was diagnosed with bipolar disorder and severe depression. She was referred for counseling and psychiatric services and prescribed medications. She followed up with a counselor at Firelands, but was terminated after two sessions for failing to appear for appointments. Mother never sought psychiatric services, and she only took her prescribed medications for a couple weeks. Instead, Mother began taking a friend's anti-depressant without oversight by a mental health professional. The caseworker cautioned Mother not to take other people's medications and to re-engage in mental health treatment. Three weeks

before the permanent custody hearing, Mother returned to the Nord Center for an assessment; but she was not forthcoming about her past mental health issues and recommendations by other professionals, and she in fact reported that she had no mental health concerns.

{¶31} Finally, Mother was required by the terms of her case plan to complete parenting classes and demonstrate her ability to parent the children. Although the caseworker referred Mother to Guidestone for their 12-session classes on three separate occasions, Mother never attended. Mother requested to go to Cornerstone instead. Although that program was not as good and thorough, the caseworker allowed Mother to participate there. Mother only completed five of the six classes, but received a certificate of completion.

{¶32} Both the caseworker and the guardian ad litem emphasized Mother's insubstantial compliance with her case plan objectives. More significantly, both noted that, despite Mother's participation in some services, she failed to demonstrate any insight into the issues that caused the removal of her children. Although she could articulate some of the information she received in her domestic violence classes, she had not made any necessary changes in her behavior to show that she would be able to keep herself or the children safe from violence in the home.

{¶33} Based on clear and convincing evidence establishing ongoing concerns regarding Mother's ability to provide a safe and secure environment for the children, notwithstanding the agency's reasonable case planning and diligent efforts, Mother had failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside of their home. R.C. 2151.414(E)(1). Under these circumstances, the juvenile court did not err by finding that the children could not be placed with either parent within a reasonable time or should not be placed with either parent, thereby satisfying the first prong of the permanent custody test.

**{¶34}** In addition, the agency established by clear and convincing evidence that Mother had "demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with [them] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[ren.]" R.C. 2151.414(E)(4).

**{¶35}** Although Mother was capable of working fulltime, her employment was sporadic and she moved from one part-time job to another, never earning enough to meet her own basic needs without assistance, let alone the needs of the children. She was $8000-$9000 in arrears in her child support obligation. Moreover, Mother only inconsistently visited with the children; she declined to take advantage of the agency's offer of extended visitation; and she completely ceased visiting with the children in December 2016, almost three months before the permanent custody hearing. Mother at all times had a driver's license and access to a car. Her required counseling appointments took only a few hours each week. Nevertheless, Mother failed to visit with the children despite her ability to do so.

**{¶36}** Based on a review of the evidence, there was clear and convincing evidence to support the juvenile court's first-prong findings that the children could not be placed with Mother within a reasonable time or should not be placed with Mother despite reasonable case planning and diligent efforts of the agency to assist her to remedy the problems that initially caused the children to be placed outside the home, based on her continuous and repeated failure to substantially remedy the conditions causing the children to be placed outside the home, and based on Mother's demonstrated lack of commitment toward the children. Accordingly, LCCS established the first prong of the permanent custody test.

**{¶37}** The juvenile court further found that an award of permanent custody was in the children's best interest. When determining whether a grant of permanent custody is in a child's

best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶38} Regarding Father, he abandoned the children pursuant to R.C. 2151.414(E)(10), and his parental rights were involuntarily terminated as to a half-sibling of these children pursuant to R.C. 2151.414(E)(11).

Interaction and interrelationships of the children

{¶39} The first best interest factor requires the juvenile court to consider the "interaction and interrelationship of the child[ren] with the child[ren]'s parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[ren.]" R.C. 2151.414(D)(1)(a).

{¶40} The caseworker, guardian ad litem, and foster mother all testified that the three children appear happy, relaxed, and well-adjusted in the foster home. A.W., I.W., and O.W. are all in the same foster home as their sibling 4-A.W., who is in the process of being adopted by the foster parents. All four children are strongly bonded with one another, as well as the foster family. The foster family is willing to adopt A.W., I.W., and O.W. to keep the sibling group together. Although Mother has an older child (six-year old C.W.) with whom she maintains a relationship, there was no evidence of any bond or relationship between C.W. and the children involved in this case.

{¶41} The foster mother testified that she is agreeable to letting Mother maintain a relationship with the children if they are placed in permanent custody and she is approved to adopt them. Throughout the case, the foster mother has sent Mother monthly pictures and updates. The caseworker and guardian ad litem agreed that Mother loves her children and, although she has become frustrated on occasion, Mother has generally interacted appropriately with them, when she has exercised visitation. The maternal grandfather, with whom Mother lives, is a long-distance truck driver who is only home on the weekends. There was no evidence regarding any significant bond he had with the children. In fact, if Mother were to regain custody, her father was only willing to help financially support the family, but not to provide hands-on care for the children.

Wishes of the children

{¶42} The second best interest factor requires consideration of the "wishes of the child[ren], as expressed directly by the child[ren] or through the child[ren]'s guardian ad litem, with due regard for the maturity of the child[ren.]" R.C. 2151.414(D)(1)(b).

{¶43} Due to the young ages of the children, they were unable to express their wishes regarding custody. The guardian ad litem opined that it is in the best interest of A.W., I.W., and O.W. that they be placed in the permanent custody of the agency.

Custodial history of the children

{¶44} The third best interest factor requires consideration of the children's custodial history, including whether they have been in the temporary custody of CSB for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c).

{¶45} A.W. and I.W. were initially removed from Mother's care when A.W. was two years old and I.W. was six months old. Those boys were placed in the legal custody of a third

party about ten months later. When that placement disrupted due to health issues of the legal custodian, A.W. and I.W. were returned to the temporary custody of the agency.

{¶46} O.W. was born prematurely and spent the first couple months of her life in the hospital. Mother rarely visited, and did not take advantage of the hospital's offer of free nearby lodging. The agency obtained temporary custody of the child upon her release from the hospital.

{¶47} A.W., I.W., and O.W. were placed in the same foster home, where their sibling 4-A.W. resides. The foster family wishes to adopt A.W., I.W., and O.W., along with their sibling to maintain the sibling group.

The children's need for a legally secure permanent placement; less restrictive options

{¶48} The fourth best interest factor requires the juvenile court to consider the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)(d).

{¶49} Mother had been involved with LCCS for over two years at the time of the permanent custody hearing. As Mother continued to have additional children with Father after A.W. and I.W. were removed, the agency continued to work with her in the interest of facilitating reunification. Nevertheless, Mother was resistant, and admittedly so, to agency intervention. It was not until a few months before the permanent custody hearing that Mother began to engage in some services. Even so, she had not attained sufficient insight to compel her to modify the behaviors that precipitated the children's removals from her home. Moreover, Mother admitted that she had not made substantial progress on her case plan objectives; but she testified that she was a young mother of five children and that she was still "learning." The caseworker testified that the children require permanency in their lives and that there is no option for permanency short of permanent custody, given Mother's lack of progress and no viable

relative or third-party placements. Both the caseworker and guardian ad litem were concerned with Mother's ability to care for the children on a permanent basis given her failure to break ties with Father, the man who abused her, and because Mother had not considered the children a priority when she failed to visit with them on a regular or recent basis. In the meantime, however, Mother evidenced her priorities by visiting another man on a weekly basis while he was serving time in jail.

{¶50} By all accounts, the children were thriving in their foster home. The foster family was willing to adopt A.W., I.W., and O.W., along with their sibling 4-A.W., to provide a permanent home for all the children. The foster family was even willing to allow Mother to maintain a relationship with the children in recognition of her love for them.

Applicability of R.C. 2151.414(E)(7)-(11) factors

{¶51} By agreement of the parties, although the juvenile court awarded permanent custody of 4-A.W. to LCCS, the juvenile court did not apply any (E)(7)-(11) factors to Mother.

Conclusion

{¶52} The record demonstrates that this is not a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of the children to be placed in the permanent custody of LCCS. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. There is an abundance of clear and convincing evidence regarding the ongoing threat to the children's safety, security, and stability arising out of Mother's failure to maintain consistent employment and financial stability; the uncertainty of the stability of her current housing situation; her lack of insight regarding her mental health issues; and her lack of insight regarding domestic violence issues, including the likelihood that she would expose the children to violence in the home because of her on-going relationship with Father. Accordingly,

the juvenile court did not err by finding that an award of permanent custody was in the best interest of the children.

**{¶53}** The juvenile court's judgment terminating Mother's and Father's parental rights and awarding permanent custody to LCCS was not against the manifest weight of the evidence. Mother's first and second assignments of error are overruled.

### ASSIGNMENT OF ERROR III

> THE TRIAL COURT ERRED IN FINDING THAT THE OLDER CHILDREN, A.W. AND I.W., HAD BEEN IN THE CUSTODY OF THE AGENCY FOR 12 OF THE PRECEDING 22 MONTHS.

**{¶54}** Mother argues that the juvenile court erred in finding that A.W. and I.W. had been in the temporary custody of LCCS for 12 or more months of a consecutive 22-month period. Based on our resolution of the first and second assignments of error, Mother's third assignment of error is rendered moot and this Court declines to address it. *See* App.R. 12(A)(1)(c).

### III.

**{¶55}** Mother's first and second assignments of error are overruled. This Court declines to address the third assignment of error. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and EMILY W. KIRSCH, Assistant Prosecuting Attorney, for Appellee.

JEANETTE M. ROBINSON, Guardian ad Litem.